Santiago Arce Acevedo, demandante y apelado, v. María de la Luz Lebis, demandada y apelante.

Núm. 6980.—*Sometido:* Noviembre 6, 1936. *Resuelto:* Febrero 12, 1937.

*Rafael Barbosa,* abogado de la apelante; *Buenaventura Esteves,* abogado del apelado.

El Juez Asociado Señor Travieso, emitió la opinión del tribunal.

Santiago Arce Acevedo interpuso demanda de divorcio contra su esposa María de la Luz Lebis, basándola en la causal de abandono por término mayor de un año. La demandada contestó negando todos los hechos alegados en la demanda.

Declarada ésta con lugar y roto y disuelto el vínculo matrimonial entre las partes, apeló la demandada imputando

a la corte sentenciadora el haber incurrido en los siguientes dos errores:

1. En la apreciación de la prueba, y en haber llegado a la conclusión de que hubo abandono por parte de la demandada, toda vez que de la prueba aparece que el abandono, si hubo alguno, fué por parte del demandante; y porque la preponderancia de la evidencia está a favor de la demandada y en contra del demandante.

2. Al dictar sentencia en la forma en que lo hizo, demostrando el juez tener pasión y prejuicio por la forma en que éste condujo el juicio, y por las conclusiones a que llegó en su opinión dictada en este caso.

La corte sentenciadora encontró probados los siguientes hechos:

"Por el resultado de la evidencia, la corte encuentra como hechos ciertos y probados que el demandante y la demandada contrajeron matrimonio en la ciudad de Aguadilla, el 2 de febrero de 1912; que de dicho matrimonio nació una hija nombrada Cándida Arce Lebis, que a la fecha de la radicación de la demanda era mayor de edad; que existen bienes gananciales sujetos a la consiguiente liquidación y partición; que desde hace muchos años ambas partes ocupaban como vivienda la planta alta de una casa sita en la calle Stahl de esta población; que allá por el mes de noviembre de 1929 en ocasión de haber sido hospedada por la demandada en el domicilio conyugal la señora Antonia Pía y de haber hecho salidas con ella la hija de este matrimoino, se creó cierta tirantez de relaciones entre el demandante y la demandada, ya que éste se oponía a la convivencia de la expresada Antonia Pía y a que se hiciera acompañar por su hija cuando salía por la población; que esta situación fué agriándose gradualmente hasta que quedó establecida una separación radical, *mensa et thoro*, entre ambos cónyuges; que en cierta ocasión el demandante .(quien venía presumiendo que su huésped non grato podría suministrarle bebedizos), arrojó a través de una ventana unos frascos conteniendo líquidos desconocidos y para él sospechosos; que a pesar del tenaz disenso del marido la señora Antonia Pía permaneció como cuatro meses en la casa de los esposos Arce-Lebis, y que tal estado de separación entre los cónyuges continuó, aunque habitando la misma planta del edificio, hasta el mes de octubre del año 1931 en que el demandante, sintiéndose abandonado por su esposa, se fué a vivir en la planta baja donde tiene es-

tablecido un comercio de provisiones; que hallándose viviendo allí cayó enfermo de algún cuidado y por bastante tiempo, siendo así que a pesar de haberse aproximado a la esposa y a la hija varias personas para noticiarles el estado de salud del demandante, ni la esposa ni la hija se acercaron al enfermo ni le brindaron clase alguna de cuidado y atenciones hasta el punto de que la propia demandada, a preguntas del abogado del actor, manifestó que ni siquiera preguntó qué médico estaba asistiendo a su marido; *que hasta la fecha de la vista de este caso la separación de ambos cónyuges ha continuado sin que haya mediado ni siquiera el más leve intento de reconciliación por parte de ninguno de ellos.''* (Bastardillas nuestras.)

La prueba testifical sometida por ambas partes, considerada en conjunto, es contradictoria en varios extremos.

▮▮▮ Tomaremos como base para resolver el caso, la prueba más favorable al demandante, o sea su propio testimonio dado en corte, en lo que es pertinente. Declaró que se casó en Aguadilla con la demandada, en febrero de 1912, de cuyo matrimonio tuvieron cinco hijos, de los cuales vive una, llamada Cándida; que allá por el mes de noviembre del año 1929 fué a vivir a su casa la señora Antonia Pía, de quien le habían dicho que se dedicaba a preparar hechizos y brujerías, por lo que prohibió a su hija que saliese con ella; que a su señora le disgustó esa actitud suya y se enojó con él, al extremo de no arreglarle la cama en que dormía; que dicha Antonia Pía se fué de su casa seis meses después, y entonces él trató de "armonizar" con su esposa, pero que ella lo impedía encerrándose en su habitación; que ni le preparaba ni servía sus alimentos; que en noviembre de 1931 se sintió enfermo mientras descansaba en una hamaca que tenía en la trastienda de su establecimiento comercial; que preguntado por un amigo si quería que su esposa fuese avisada, contestó que sí; que el amigo le informó que su esposa había dicho que no quería saber más de él; que desde entonces no volvió él más a su hogar; que la separación entre ellos se originó con la presencia de Antonia Pía en su casa; que atiende a todas las necesidades de su casa; que su enfermedad duró unos ocho días, y

más de veinticinco la convalecencia; que su esposa no fué a verle durante ese tiempo y que sus alimentos se los preparaba doña Rosita Esteves, hermana de su abogado; que para las navidades del año 1932 trató de conseguir una reconciliación con su esposa a través de Miguel H. Díaz.

Quizás sea conveniente añadir que de acuerdo con el testimonio incontrovertido de la demandada, corroborado por el de su hija Cándida, la señora Antonia Pía acostumbraba desde hacía muchos años, pasarse temporadas en el hogar del demandante, sin que nunca, hasta el año 1929, tuviera éste nada que objetar a ello. También debe mencionarse el hecho de que a no ser por la propia declaración del demandante, nada aparece en el récord que tienda a arrojar sombras sobre el carácter, reputación y honorabilidad de Antonia Pía.

En noviembre de 1931, el demandante se separó definitivamente de su esposa, de su hija y de su hogar. No es éste el caso corriente de divorcio por abandono, en que el cónyuge abandonado pide la disolución del vínculo matrimonial. En este caso la demandada permaneció con su hija en el hogar que siempre lo había sido de las partes en esta acción. La prueba del demandante debe ser, pues, mucho más robusta y clara que de ordinario.

De acuerdo con los estatutos sobre divorcio, la causa razonable que puede justificar el abandono de un cónyuge por el otro, debe ser una conducta de tal naturaleza que pueda constituir causa para una demanda de divorcio en contra del cónyuge que permanece en el hogar. Véanse: *Rie* v. *Rie,* 34 Ark. 37; *Craig* v. *Craig,* 117 S. W. 763.

Aceptando como hechos ciertos y probados el disgusto que produjo al demandante la presencia en su hogar de la señora Antonia Pía; la negativa de su esposa a echarla de su casa y los disgustos y desavenencias entre los cónyuges como consecuencia de tal negativa, esos hechos no serían por sí solos suficientes para basar en ellos una demanda de divorció en contra de la esposa, y no pueden por

tanto ser causa bastante para justificar el abandono de la esposa por el esposo demandante. La prueba demuestra fuera de toda duda, que fué el demandante quien se marchó del hogar, dejando allí a su esposa e hija. Las desavenencias y disgustos entre el demandante y su esposa no son de tal importancia y gravedad que no puedan ser olvidados o que hagan imposible una reconciliación entre las partes. En realidad, la prueba es insuficiente, a todas luces, para sostener la alegación de abandono por parte de la esposa. Ambos cónyuges han seguido viviendo bajo el mismo techo, ella, en la planta alta de la casa, acompañada por su hija, y dispuesta a recibir al esposo en su mesa y en su lecho, según lo han declarado ella misma y su hija; él, en la planta baja de la misma casa, atendiendo a las necesidades económicas de esposa e hija, recibiendo unas veces y rechazando otras los alimentos que le han sido enviados por su familia, y haciendo gestiones por medio de amigos y de abogado para inducir a la esposa a que presentase ella la demanda de divorcio, proposición que tiende a demostrar que el esposo, no estando seguro del éxito de una demanda iniciada por él, como abandonado por la esposa, buscaba un convenio mediante el cual ella alegaría el abandono y él permitiría que se dictase sentencia en rebeldía. La negativa de la esposa a entrar en tal convenio, su oposición al divorcio que solicita el marido, y su disposición a recibir a éste en el hogar son fuertes indicaciones de que es él y no ella quien desea romper el vínculo matrimonial, por causas a nuestro juicio frívolas y sin importancia. La ley y la moral pública requieren algo más que esas pequeñas desavenencias, frecuentes en la vida matrimonial y que con igual frecuencia se desvanecen como nubes de verano, para justificar una sentencia disolutoria del vínculo matrimonial.

Aceptando como verídicas las declaraciones del demandante y de sus testigos, debemos plantear el problema jurídico en esta forma: ¿Tendría derecho el demandante a un decreto de divorcio, por el hecho de que su esposa albergó

en su casa por una temporada a una amiga que para él no era persona grata; porque la esposa no le arregló su habitación a tiempo; porque no le servía las comidas a su gusto; porque no atendía de acuerdo con sus deseos a los quehaceres domésticos; y porque ella se negara a hacer vida marital con él, según las palabras de la propia demandada, por haber visto "muchas cosas que para mí han sido muy dolorosas y tristes y que no las nombro porque me da vergüenza"? Seguramente una demanda basada en tales hechos no podría prosperar, pues nuestro Código Civil, a pesar de su liberalidad, no reconoce hechos de tal naturaleza entre las causales de divorcio. Y esa situación jurídica no puede cambiarla el demandante con sólo mudarse de habitación y tomar sus comidas en una fonda.

Esta corte, en Dueño v. Dueño, 28 D.P.R. 977, ha resuelto que:

"La vaga manifestación de que el demandante estaba enfermo de alguna gravedad no implica necesariamente que él necesitara ningún cuidado o atención especial por parte de la demandada, o que no pudiera tomar sus medicinas sin ayuda de alguien, ni siquiera que estuviera recluído en cama. Por el contrario, el demandante parece haber estado en condiciones no sólo de atender a sus propias necesidades, sino de trasladarse a la casa de sus padres, si bien no consta cuál fuera la distancia recorrida, los medios de traslación empleados, ni la forma en que los utilizó."

A la página 981, se dice en la misma opinión lo siguiente:

"El dejar de prodigar atenciones hacia un esposo que se encontraba más o menos indispuesto, o hasta el dejar de administrarle los medicamentos, difícilmente puede considerarse como constitutivo de trato cruel, y sin que exista algo más, como justificativo del abandono por parte del marido, de la esposa, hogar e hijos."

Véase: *Figueroa* v. *Pierluisi*, 25 D.P.R. 496.

En el caso de *Axtmayer* v. *Ortiz*, 19 D.P.R. 499, se dice, a la página 502, lo que sigue:

"El demandante alega una negativa por parte de su esposa a cumplir con sus obligaciones conyugales y la prueba es contradictoria

en cuanto a ese punto. Encontramos que en algunos Estados la persistente y continuada negativa por parte de uno de los esposos a hacer vida marital, sin que exista una justa causa para ello, constituye un abandono aunque las partes continúan viviendo en la misma casa. Sin embargo, de acuerdo con la mayoría de las autoridades, la mera separación del lecho marital no es suficiente motivo para constituir tal ofensa. Es necesario que exista también un completo abandono de otras obligaciones conyugales. *Fritz* v. *Fritz*, 138 Ill. 436; *Throckmorton* v. *Throckmorton*, 86 Va. 768; *Fink* v. *Fink*, 137 Cal. 559.

"Deberá notarse que si bien el demandante alega que la demandada se negó a cumplir con sus obligaciones conyugales, clasifica, sin embargo, estos actos como constitutivos de *crueldad* y no de *abandono*, y alega que la crueldad consiste entre otras cosas en la negativa a hacer vida común con el demandante. No se encuentra así establecido en las resoluciones que hemos podido examinar y en muchos casos se ha resuelto que la negativa a hacer vida común debe ser de tal naturaleza que obligue a la parte agraviada a abandonar el hogar de su familia, y que éste haya sido el fin perseguido por la parte culpable lo que solamente constituye un abandono al transcurrir el término que el estatuto fija para el mismo. *Holston* v. *Holston*, 23 Ala. 777; *Sisemore* v. *Sisemore*, 17 Oregon 542; *Camp* v. *Camp*, 18 Texas 528."

En *Fernández* v. *Hernández*, 8 D.P.R. 237 (243), se dijo por esta corte:

"Tiene razón el Juez sentenciador. El cónyuge que ejercita la acción trascendental de divorcio que ha de romper el vínculo matrimonial y destruir el hogar que nació por el mutuo amor y en donde existen hoy hijos inocentes, debe estar limpio de toda culpa, debe ser una verdadera víctima que agotó todos los medios amistosos para detener el mal en su origen."

Véase: *Kennerly* v. *Kennerly*, 29 D.P.R. 777.

■■ No encontramos en el récord prueba suficiente de un propósito firme y decidido por parte de la demandada de vivir separada de su esposo. Por el contrario, ésta declaró a preguntas de su abogado, como sigue:

P.—Dígame, señora: ¿usted está dispuesta y ha estado dispuesta siempre a vivir con su esposo y a seguir como estaban antes de haberse él marchado?

R.—Yo siempre traté de evitar todo disgusto entre nosotros y pasé por todo y vi muchas cosas que para mí han sido muy dolorosas y tristes y que no las nombro porque me da vergüenza, y a pesar de todo siempre traté de evitarlo todo para que hubiera paz y unión en el hogar porque siempre tuve la fe de que todo eso pasaría y que él volvería a ser como antes.

P.—¿Actualmente usted está dispuesta a vivir con su esposo?

R.—Siempre he estado y estoy dispuesta a vivir con mi esposo porque siempre lo he querido.

P.—¿Y aún lo quiere?

R.—Y lo quiero y es el padre de mi hija y si hubiera venido lo hubiera aceptado en cualquier momento.

Del récord no aparece que el esposo demandante haya expresado en momento alguno iguales sentimientos de amor o deseos de reconciliación con su esposa.

Es de perfecta aplicación el caso de *Más Guardiola* v. *Muñoz,* 35 D.P.R. 870, donde se dijo:

"No basta el hecho material de la separación; no son suficientes meros disgustos. Es necesario el propósito firme y deliberado y la actuación consiguiente de vivir separado, de romper de hecho el vínculo matrimonial, para que el abandono exista. Y aquí la mujer no ha procedido de tal modo. Declarando en el juicio se expresó así: 'que nunca ha sido su intención separarse definitivamente de su esposo, no lo ha pensado, como lo ha querido mucho y es el padre de sus hijos, es el único hombre que ha querido.' "

La corte sentenciadora cometió manifiesto error al resolver que la separación de los cónyuges, *a mensa et thoro,* por un término mayor de un año, tiene el mismo efecto legal que el abandono, para que pueda decretarse el divorcio de acuerdo con el inciso 5 del artículo 96 del Código Civil, Edición de 1930, según fué enmendado por la Ley núm. 46 de mayo 9 de 1933, leyes de ese año, página 305. Esa separación, de mesa y lecho, no puede ser causa de divorcio, a menos que haya continuado sin interrupción por un período de más de siete años, según lo dispone el inciso 9 del citado artículo. La prueba aducida por ambas partes establece claramente la separación de los cónyuges, pero es a nuestro juicio insuficiente para establecer la alegada causal de abandono del ma-

rido por la mujer, especialmente si se tiene en cuenta que el mismo juez sentenciador hace constar en su opinión que no ha mediado ni siquiera el más leve intento de reconciliación por parte de ninguno de los cónyuges. ¿Cómo es posible sostener que un cónyuge ha sido abandonado, si éste no ha hecho ni siquiera el más leve intento para reconciliarse con el otro?

El segundo error señalado carece en absoluto de fundamento y debe ser desestimado.

*Se revoca la sentencia apelada.*

Los Jueces Señores Presidente del Toro y Asociado Wolf no intervinieron.