José J. Gómez, demandante y apelado, *v.* Lucila Trujillo, demandada y apelante.

Núm. 8240.—*Sometido:* Noviembre 6, 1941. *Resuelto:* Noviembre 13, 1941.

*Dubón & Ochoteco* y *Otero Suro & Otero Suro,* abogados de la apelante; *C. Iriarte, F. Fernández Cuyar, H. González Blanes* y *F. Alvarado, Jr.,* abogados del apelado.

El Juez Presidente Señor Del Toro emitió la opinión del tribunal.

Este es un caso de divorcio instado por el marido en contra de la mujer, fallado por la corte de distrito declarando roto y disuelto el vínculo matrimonial.

El marido alegó que fué abandonado por su mujer desde mediados de 1936 y, además, que su mujer lo había injuriado y tratado cruelmente. Negó la demandada ambas imputaciones. Fué el pleito a juicio. El Juez Berga ante quien se celebró, dejó de existir y el caso pasó al juez en comisión J. A. González, quien apreció la evidencia como sigue:

"Hemos leído cuidadosa y detenidamente toda la evidencia practicada por ambas partes, y después de estudiar las declaraciones de los testigos, y especialmente los testimonios del propio demandante y de la propia demandada, estamos firmemente convencidos de que tanto legalmente como moralmente al demandante le asiste la razón. Surge de toda la prueba la existencia de una intolerable situación dentro del hogar creada mayormente por las intransigencias, violencias y el carácter irascible y tempestuoso de la demandada. Las declaraciones de la parte demandada y de los testigos por ella presentados no solamente son en su gran mayoría poco dignas de crédito, en vista de la improbabilidad de que sucediesen los hechos en la forma por ellos puesta de relieve, aunque en muchos detalles corroboran las declaraciones categóricas de los testigos de la parte demandante. Surge con gran fuerza de una lectura serena, fría e imparcial de la prueba aducida el hecho evidente y obvio de una imputación injustificada de relaciones impropias entre el demandante y la testigo Elena Lewis. Si bien toda la teoría de la parte demandada gira alrededor de estas supuestas relaciones, la evidencia carece en alto grado de poder persuasivo y no nos convence de la realidad de estas relaciones. Prácticamente podemos concluir que tal imputación carece de base y no está sostenida por la prueba.

"Con excepción de lo declarado por la propia demandada, y ello en forma tal que no podemos darle crédito, los hechos puestos de relieve por la evidencia del demandante no fueron seriamente impugnados. La agresión que describió en forma desinteresada, clara y categórica el policía insular Angel Borrero, ocurrida en una calle pública, cuando la demandada abofeteó al demandante en forma inusitada y sin justificación de clase alguna; las palabras ofensivas,

insultantes e injuriosas proferidas por la demandada al demandante delante de don Luis Noble, propietario de un establecimiento de mecánica en la Avenida Fernández Juncos, y el hecho de haberse tenido que lanzar el demandante por una ventana de su propia casa huyendo del acometimiento intentado por la demandada con un revólver, acompañado de la intención expresada de matar al demandante, todo esto escuchado por dicho testigo Noble; el acometimiento ocurrido también en público, cerca del cine Puerto Rico, acompañado también de palabras ofensivas e injuriantes, sobre el cual declaró el testigo Domingo Rivera Rivera; el abandono de hogar que hizo la demandada llevándose sus hijos, yéndose para la casa de la Sra. Caballero, quien declaró también que dicha demandada le había manifestado definitivamente que no quería volver a vivir con el demandante, que éste fué a buscarla y ella le repitió que no quería vivir más con él; todos estos hechos, independientemente de los evidenciados por la declaración del propio demandante, revelan un trato cruel continuamente administrado por la demandada al demandante e injurias de carácter grave reiteradamente proferidas tanto en público como en privado, aun en la presencia de los hijos del matrimonio. Es fácil explicarse la actitud del demandante, quien se vió obligado a irse a vivir a casa del Sr. Fernández Abarca, no obstante tener su propio hogar, para evitar que sus hijos sufrieran las consecuencias de la actuación de la demandada.

"Revela la prueba, por otro lado, que el demandante es un hombre formal, serio y cumplidor de sus deberes. No solamente surge de una alegación específica de la contestación (defensa especial marcada IV) que el demandante siempre ha atendido a los gastos de la alimentación de la demandada y de sus hijos y a todas sus otras necesidades materiales, si que de la prueba resulta que la casa donde viven todos los componentes de la familia menos el propio demandante, es propiedad de éste y en adición a ello, el demandante le pasaba $20 semanales y luego $12 semanales a la demandada y a sus hijos. Resulta claro además, y ello es lógico y fácil de creer, que los reiterados actos de agresión, tanto de hecho como de palabra, de la demandada para con el demandante han enfermado a éste su sistema nervioso y como consecuencia le han afectado en su peculiar trabajo en los talleres de la Casa Abarca, el cual requiere un pulso muy sereno y poco nervioso. La evidencia al efecto de que el demandante se ha visto obligado a acudir frecuentemente al Auxilio Mutuo, un hospital, para ser tratado de los nervios, debido a los actos de la demandada, no fué en forma alguna contradicha. En la

declaración de la demandada encontramos un dato sumamente significativo y que ilustra casi gráficamente la actitud mental de dicha parte. Refiriéndose al demandante, dice: 'Él es muy necesario *para la alimentación de mis hijos.*' (Itálicas nuestras.) Ciertamente no revela esta afirmación la existencia del 'amor entrañable que siempre ha profesado y continúa profesando' la demandada al demandante, como lo alega en su contestación. La necesidad que tenía la demandada del demandante no estribaba más que en la alimentación de los hijos.

"Damos entero crédito a las declaraciones obviamente desinteresadas del policía insular Angel Borrero y del Sr. Luis Noble, y asimismo creemos el testimonio del demandante. Los actos de agresión, los insultos, las malas palabras y las ofensas en público, en privado y delante de los hijos, han quedado, a nuestro juicio, debidamente probados, y así también el hecho de que todo ello era reiterado y constante así como su efecto perjudicial en la salud del demandante y en su eficiencia para el trabajo. No tenemos duda alguna de que la conducta entre las partes es tal que hace intolerable la vida conyugal, y especialmente el daño mayor de esta intolerable situación recaerá en los hijos menores."

Y aplicó la ley y la jurisprudencia, así:

"Se ha resuelto que el uso sistemático y continuado de lenguaje soez, blasfemo y áspero por parte del marido en presencia de la mujer y dirigido a ella que le cause sufrimiento mental y que pueda convertirse en un daño permanente para su salud le da derecho a que se decrete el divorcio a su favor. *Axtmayer* v. *Ortiz,* 19 D.P.R. 499. El mismo derecho tiene naturalmente el marido en igualdad de circunstancias. En dicho caso de *Axtmayer,* nuestro Tribunal Supremo, explicando los requisitos de la prueba en estos casos, se ha expresado en la siguiente forma:

"'Al determinar cuál es la conducta que generalmente puede constituir crueldad por parte de cualquiera de los esposos debemos tener en cuenta las disposiciones de los estatutos y las circunstancias de cada caso en particular, teniendo siempre en consideración las condiciones físicas y morales de las partes así como el carácter y condición social de las mismas. Por lo menos debe probarse que la conducta entre las partes es tal que hace intolerable la vida conyugal; y que aunque en algunos estados no es necesario probar que realmente ha habido daño corporal o temor de que se cause, sin embargo, la conducta debe ser de tal naturaleza que destruya la tranquilidad de

espíritu y felicidad de la parte agraviada, de manera tal que perjudique a su salud o anule enteramente los fines legítimos del matrimonio.' (Páginas 501, 502.)

''No puede haber duda razonable alguna de que, dadas las circunstancias de este caso en particular y tomadas en consideración las condiciones físicas y morales de ambas partes, así como su carácter y condición social, la conducta de la demandada destruyó la tranquilidad de espíritu, la felicidad, la eficiencia y aun en parte la salud del demandante. Si bien es cierto que la mera aspereza de lenguaje, el mal genio o el rigorismo de carácter que no perjudica o quebrante la salud, no es un fundamento suficiente para justificar el trato cruel a que se refiere el artículo 96, inciso cuarto de nuestro Código Civil (Edición 1930), en el presente caso no solamente han concurrido estos extremos, si que también los que anteriormente hemos enumerado, y todos juntos determinan el trato cruel e injurias graves justificativas del derecho del demandante a que se decrete el divorcio a su favor. No se trata de lenguaje ofensivo o insultante usado en una sola ocasión aislada, en unión con el abandono evidenciado por la prueba toda. *Figueroa* v. *Pierluisi*, 25 D. P.R. 496.''

No conforme la demandada, apeló. Señala en su alegato dos errores, cometidos por la corte el primero al apreciar la evidencia y el segundo al decretar el divorcio sin causa suficiente para ello.

■ Como el juez que falló el pleito no fué el que intervino en el juicio, nos encontramos en las mismas condiciones en que él se encontrara para apreciar y pesar la evidencia. Nuestra conclusión es distinta. A nuestro juicio la demanda debe ser declarada sin lugar.

■■ Creemos que puede admitirse que quedó probado que una noche del año 1936, en Santurce, entre la farmacia Olimpo y el teatro Paramount, en la acera, el policía insular Angel Borrero vió cuando la demandada se acercó al demandante y diciéndole que debía estar en su casa, lo acometió y agredió, que el policía intervino y el demandante le dijo que se trataba de su esposa, a quien montó en un auto que había al frente, retirándose los dos en él; que cierta tarde de dicho año Luis Noble fué a la casa de los esposos Gómez-

Trujillo llamado por el esposo para encargarle la reparación de su auto y cuando Gómez pidió a su esposa la llave ella le dijo que la buscara él, tratándolo de sinvergüenza y canalla, y que Noble no queriendo oír más se fué, y que en otra ocasión estando Noble una noche en la calle vió a Gómez salir corriendo de su casa y oyó a la señora Trujillo que decía "párate ahí, que te voy a matar"; que en otra noche del 1936 estando Domingo Rivera parado frente al cine Puerto Rico vió a Gómez sólo, recostado en la verja, cuando se le acercó la señora Trujillo y le dijo, "¿Qué tú haces ahí, zángano? ¿Por qué no te vas para mi casa?"; que Rivera intervino aconsejando a Gómez que no hiciera caso y que varias personas presenciaron el incidente; que una noche Lucila Trujillo se presentó con sus cuatro hijos en casa de Sixta Caballero porque había tenido un disgusto con su esposo, diciéndole que no quería volver a vivir con él, que Gómez fué a buscarla, y que estuvo allí cuatro días al cabo de las cuales volvió a la casa de su esposo.

Y puede admitirse además que no hay prueba de que el marido cometiera adulterio y que es cierto que marido y mujer vivían separados desde hacía más de un año cuando la demanda se interpuso.

Pero si todos esos hechos se examinan a la luz de lo que demuestra la prueba de la demandada, tendrá que concluirse necesariamente que no existe el abandono del marido por parte de la mujer y que si bien ésta realizó actos indebidos en las ocasiones indicadas, lo fué pasionalmente, excitada por la conducta incorrecta de su esposo en sus relaciones con otra mujer.

Examinemos en primer término el alegado abandono. Contestando a preguntas de su abogado, el propio marido declaró en el juicio: "¿Usted dice que lo botaron de su casa? R.—Sí, señor. . . . Eso fué allá por el 1936. Mi señora me dijo que si yo no me iba, ella se iba; me dejó una carta donde me decía . . . la carta la cogió ella y la destruyó . . . cuando me dejó el papel, se fué para casa de

Sixta Caballero . . . Fuí a suplicarle que viniera, que yo me iba, y dijo que no, que cuando fuera que no estuviera yo en casa y yo le dije 'vayan para que vean cómo está la casa que yo me voy en seguida' y entonces le hablé a don Ramón Fernández y me dijo 'bueno, vente para acá' . . . Le pasaba para alimentos $20, luego le he estado pasando $12.''

Lo que vamos a transcribir de la prueba de la demandada, entrando de lleno en el examen de la otra causa de acción—trato cruel e injurias graves—explica la actitud asumida por el demandante.

La primer testigo llamada a declarar fué Elena Lewis, la amiga del marido. Dijo que hacía bastante tiempo que conocía a Gómez quien le fué presentado por unos cuantos amigos en un paseo en San Juan; que no conoce a su esposa ni sabe si es casado; que durante tres años ha salido varias veces con él.

Se le presentó un retrato y lo reconoció como el suyo, explicando que lo había perdido con otros de sus familiares que tenía en una cartera que desapareció de su casa hacía cosa de un año. No sabe si el retrato estuvo en manos de Gómez.

Seguidamente compareció Angeles Gómez, hija del matrimonio Gómez-Trujillo, cajera del establecimiento mercantil ''La Bayamonesa''. Manifestó que vivía con su mamá y sus cuatro hermanos. Su padre no vivía con ellos desde hacía tres años. Los visita a menudo. Durante el primer año a veces dormía en la casa.

Se le pidió que explicara por qué su padre no vivía con ellos y dijo: ''Mi padre tenía una amiga . . . Y a mi madre no le agradaba que él estuviera saliendo con tanta frecuencia con esa amiga, y empezaban a discutir por eso; y un día mi madre salió con la señora Cestero . . . y volvió mi padre y mi madre, los dos se encerraron en el cuarto y después mi madre salió, se metió con nosotros en la sala, y él le pegó delante de nosotros.''

Esa misma noche se fueron a casa de Sixta Caballero. Al volver a su casa, sus padres siguieron viviendo juntos, pero como su padre continuaba saliendo con su amiga, se suscitaban siempre discusiones. "Entonces mi padre se fué. Hasta ese tiempo mi padre había sido un padre modelo. Nos llevaba a pasear. Siempre salíamos con él. Desde que conoció a Elena Lewis no hubo paz."

Trinidad Cestero declaró que conocía desde 1935 a los esposos Gómez-Trujillo a quienes visitaba. "Vivían felices, un hogar que yo envidiaba . . . porque salían siempre juntos, y cuando no (él) se quedaba en la casa." La felicidad no duró "pues él (Gómez) tenía gran amistad con el esposo mío, salían juntos, y una noche tuvo oportunidad de conocer (en el Nilo) a una amiga, que la presentó el esposo mío, que andaba como amiga de él, Elena Lewis."

Cuando Gómez se fué de la casa, ella "lo llamó y le dijo que no se fuera . . . porque ella (la esposa) le dijo que él (Gómez) se quería ir . . . Lo aconsejó recordándole que tenía hijas señoritas y hacía falta en su casa, y que después de vivir tantos años felices, ella (la esposa) lo quería mucho y sufría por su ausencia."

Refiriéndose a la noche en que ocurrió el incidente referido por el policía Borrero, dijo que salió con la esposa de Gómez y otra señora para la farmacia de Blanco y como la esposa viera el auto de Gómez frente al Paramount se montó en él, quedándose allí, siguiendo ella con la otra señora, y que luego encontró a la esposa en su casa llorando porque Gómez le había pegado.

José Gómez, de catorce años, hijo del demandante y de la demandada, fué el siguiente testigo. Declaró que su padre no vivía en su casa desde hacía tres años. El juicio se celebró en 1939. Reconoce un reloj que su padre había usado por muchos años y le regaló. Tenía en la tapa de atrás el retrato que Elena Lewis admitió que era el de ella y dijo que se le había perdido. Asegura que su padre le pegaba

a su mamá. Se refiere específicamente a la noche en que su mamá y ellos—los hijos—se fueron de la casa, y dice: "Ellos llegaron de la calle. Mi papá y mamá y se encerraron en el cuarto; al rato mi mamá salió corriendo, entonces yo cogí el revólver y lo llevé a casa de la señora Cestero y ella lo guardó." El revólver se lo dió su mamá. Ésta, en su declaración, explica lo del revólver, así: "El revólver estaba en un *closet* y cuando lo ví a él que abrió el closet, me imaginé que iba a cogerlo para usarlo, y entonces yo le quité el revólver y abrí la puerta y se lo dí al nene y el nene salió corriendo con él."

Rosalía Maysonet, una señora que vivía al frente de los esposos Gómez-Trujillo y que tuvo amistad con ellos por once años, manifestó que "ellos vivían muy bien hasta allá tres años, que no están de acuerdo." Las divergencias surgieron "porque él se enamoró de la señora Elena que está aquí." Fueron muchas veces las que los vió juntos.

Por último Lucila Trujillo declaró que llevaba veinte y tres años de casada con el demandante y tenía cuatro hijos y una de crianza, "la mayor tiene 19 años; la segunda, Josefina, 17; el tercero, José, 14; y el más pequeño, Gustavo, 12, y la niña que hemos criado, 17." Viven en la calle Silva, 13, desde el 1928. Antes vivieron ocho años en la parada 15, y con anterioridad en la Marina, frente a los talleres de Abarca. Cuando se casó su esposo trabajaba con Abarca y sigue trabajando en la actualidad. El tomó una habitación fuera de la casa el 13 de junio de 1936. Lo demás lo siguió haciendo en la casa por un año. Luego se fué definitivamente . . . parece que a él le molestaba que yo le dijera que no me gustaba verlo andando con esa mujer, Elena Lewis.

"Antes su conducta era ejemplar. Imagínese, si él era bueno yo tenía que ser mejor."

Cuando supo de sus relaciones, "le dije a mi esposo que yo estaba enterada que él salía con esa señora y que le había

ofrecido casarse con ella; y entonces yo le dije que me parecía que los años que llevávamos de casados eran muchos, que teníamos hijos grandecitos ya que necesitaban de él . . . Él primero decía que a mí no me faltaba nada, que él seguiría siendo igual; que él no faltaba a su casa, y que yo no debía intervenir en los asuntos de él fuera de la casa; pero después decía que a mí no me importaba y que él podía hacer todo lo que le diera la gana y tener todas las que él quisiera.''

No obstante todo lo ocurrido la demandada alegó en su contestación y declaró en el juicio que deseaba que su esposo volviera a su hogar porque lo seguía queriendo.

El testimonio es extenso. Difícil de resumir. Es cierto que cuando el abogado de la parte contraria le pregunta sobre los varios incidentes que tuvo con su esposo en la casa y fuera de la casa, se observa que elude toda responsabilidad y tiende a aminorarlos. Oculta, sin duda, entonces, parte de la verdad, innecesariamente a nuestro juicio porque aun llevados esos incidentes a su extremo mayor, no revelan un alma cruel, sino falta de control, apasionada, que sin deliberada maldad va más lejos de lo que debe desesperada a virtud de la conducta del esposo.

No puede afirmarse en verdad que éste llegara a, cometer adulterio, pero sí puede concluirse que su conducta fué capaz de producir en el ánimo de su esposa los trastornos que produjo, y por tanto que debe sufrir las consecuencias de sus actos y no aprovecharse de ellas para destruir el hogar que con su esposa formara.

El bienestar de los individuos y de las sociedades exige la preservación del hogar. Casos existen en que ello no es posible y el propio legislador se ha encargado de fijarlos. Entre ellos se encuentran los del abandono y trato cruel e injurias graves, pero el abandono no quiere decir simplemente la separación. Quiere decir la voluntad firme y deliberada de abandonar. Y el trato cruel y las injurias graves

sólo existen cuando revelan el propósito dañado y persistente de herir, de amargar; no cuando se originan en momentos de súbita pasión.

A nuestro juicio, como ya dijimos, el divorcio no procede. No hay motivo justificado para que. el esposo en contra de la voluntad de su mujer, obtenga una sentencia declarando roto y disuelto el vínculo matrimonial que a ella lo une. Su hogar lo espera. Vuelva a ser el mismo de antes y al cabo de los años se sentirá agradecido al tribunal que no le concedió su petición.

Su sitio está al lado de la compañera que cuando comenzó a trabajar rudamente como mecánico, compartió con él estrecheces y sufrimientos. Sus hijos están clamando por su buen ejemplo que será su mejor guía. Que la prosperidad que lo llevó al parecer a la obtención de automóviles, y a diversiones y amistades peligrosas, no siga perturbando su mente y en vez de envolverlo por completo en su torbellino, sirva para consolidar su hogar, robustecerlo y prepararlo para cuando las fuerzas para el trabajo falten.

La jurisprudencia con respecto a lo que se entiende por abandono y trato cruel e injurias graves como causas de divorcio, es clara, terminante. La propia que anota el juez sentenciador sostiene el criterio que hemos aplicado. Fué invocada erróneamente. Véanse además en cuanto al abandono los casos de *Moll* v. *Llompart*, 17 D.P.R. 694, *Arce* v. *Lebis*, 50 D.P.R. 899 y los en ellos citados, y en cuanto al trato cruel y las injurias graves, los de *Fernández* v. *Hernández*, 8 D.P.R. 237, *Galip* v. *Drag*, 28 D.P.R. 818, *Figueroa* v. *Pierluisi*, 25 D.P.R. 496, *Manich* v. *Quero*, 38 D.P.R. 93 y los en ellos citados.

*Debe declararse con lugar el recurso y revocarse la sentencia apelada, dictándose otra desestimando la demanda con costas.*