FRANCISCO DELGADO, demandante y apelado, *v.* ELVIRA MERCADO, demandada y apelante.

Núm. 8369.—*Sometido:* Abril 21, 1942. *Resuelto*: Junio 18, 1942.

*Villamil & Santana Becerra* y *Pedro Juan Alcalá,* abogados de la apelante; *Dubón & Ochoteco* y *Otero Suro & Otero Suro,* abogados del apelado.

Eᴌ Jᴜᴇᴢ Pʀᴇsɪᴅᴇɴᴛᴇ Sᴇñᴏʀ Dᴇᴌ Tᴏʀᴏ emitió la opinión del tribunal.

Éste es un pleito de divorcio iniciado por el marido en contra de la mujer por trato cruel e injurias graves, fallado en favor del marido. La mujer apeló. Se perfeccionó el recurso. Recomendó el fiscal la revocación de la sentencia. Y el caso quedó finalmente sometido a la decisión del tribunal.

En su demanda el demandante alega que contrajo matrimonio con la demandada en Aibonito el 16 de abril de 1919, habiendo procreado un hijo que tiene diecisiete años de edad, y que, sin motivo justificado, desde el principio del matrimonio, su mujer comenzó a maltratarlo e injuriarlo gravemente, insultándolo en público y en privado y acometiéndolo y agrediéndolo frecuentemente, de tal modo que su salud quedó hondamente afectada hasta que allá por junio de 1936, temiendo por su vida, se vió precisado a separarse de su esposa.

En su contestación la demandada admitió el matrimonio y la existencia del hijo y negó que hubiera insultado, injuriado, acometido o agredido a su esposo. Como materia nueva alegó que el demandante la había abandonado temporalmente en dos ocasiones anteriores para vivir con otras mujeres, volviendo al hogar cuando por una causa u otra dichas relaciones terminaron, y que su marido ha pretendido varias veces que ella le conceda el divorcio para poder cumplir compromisos de matrimonio y ella ha rehusado.

Fué el pleito a juicio. Se practicó la evidencia y la corte sentenciadora, después de referirse a ella en su relación del caso y opinión, se expresó así:

"Del estudio y análisis que hemos hecho de la prueba en este caso llegamos a la conclusión de que la conducta de la demandada hace imposible la vida conyugal de las partes, conducta que ha sido

de tal naturaleza que ha destruído la tranquilidad de espíritu y felicidad del demandante, anulando los fines legítimos del matrimonio.

"Los actos realizados por la demandada y las frases pronunciadas por la misma contra su esposo son de tal naturaleza, que el malestar producido por los mismos es por sí solo un trato cruel. Dichas frases no fueron pronunciadas en momentos de excitación por la demandada; son más bien el producto de un estado de ánimo persistente de odio y rencor, y fueron pronunciadas con el único fin y propósito de ridiculizar, ofender y maltratar al demandante.

"Una de las causales de divorcio autorizadas por nuestro Código Civil es 'El trato cruel o las injurias graves.' (Sec. 4, art. 96 Código Civil, edición 1930.)

"Somos de opinión que las frases y palabras dirigidas por la demandada al demandante en distintas ocasiones, tal y como lo demuestra la evidencia, son insultos de la clase más ofensiva y grosera que revelan el propósito de desdorar o menospreciar al demandante, y que llevan en sí el 'animus injuriandi.'

"La alegación tercera de la materia nueva de defensa alegada bajo juramento por la demandada en su contestación corrobora nuestras conclusiones, sostenidas por la prueba, del propósito persistente de la demandada de injuriar a su esposo, al imputarle al mismo la comisión de actos de adulterio en dos ocasiones y el nacimiento de hijos como consecuencia de tales actos, alegación que quedó huérfana de toda prueba.

"Apreciada por la corte, en conjunto, toda la prueba de las partes, y estimando que la preponderancia de la misma está a favor del demandante, procede se declare con lugar la demanda."

El reglamento de esta corte, Código de Enjuiciamiento Civil, ed. 1933, página 314, dispone que el tribunal pedirá que se haga por el fiscal un examen cuidadoso de los autos en las causas de divorcio y que presente un informe relacionando los hechos principales y expresando los principios legales que dichas causas envuelvan, así como su recomendación en cuanto a la resolución que deba dictar el tribunal y su opinión respecto al efecto que tal resolución pueda tener sobre la moral pública, en vista de todas las circunstancias que consten en los autos.

Cumpliendo ese deber reglamentario, el fiscal de esta corte presentó su informe. El párrafo final del mismo, lee así:

"Es verdad que es doctrina generalmente aceptada que este Hon. Tribunal no intervendrá con las conclusiones de hecho a que llegue el juez sentenciador, a menos que se demuestre pasión, prejuicio o parcialidad o un manifiesto error. Es también cierto que entre el caso de autos y el invocado por nosotros de *Gómez* v. *Trujillo* existe la diferencia de que el juez que falló este último no fué el juez que vió la prueba sino que lo resolvió por el récord que le fué sometido por las partes; pero aún admitiendo la existencia de la doctrina sentada y el hecho que diferencia ambos casos, en el de autos existe, a nuestro juicio, tan manifiesto error al apreciar la prueba aportada que bien estaría, en nuestra opinión, justificado este Hon. Tribunal en revocar la sentencia apelada.

Creemos que el fiscal tiene razón. Apenas se comienza el estudio de la evidencia, se encuentra la causa de los disgustos habidos en el matrimonio. El primer testigo que declaró fué el propio demandante. Es un fotógrafo profesional que contrae matrimonio en Aibonito en 1919 y va a vivir a Guayama, donde se encarga de cierto trabajo que realiza en la farmacia Martínez. Su esposa se le apareció en el sitio del trabajo diciéndole que no quería estar sola. Él se puso de mal humor. Ella le dijo que quería irse de Guayama "porque se sospechaba que yo tenía otros 'pleitos.' "

Dijo que lo que ella quería era irse para los Estados Unidos; que por eso se casó con él. Se trasladaron a Ponce donde trabajó en la fotografía del Sr. Tejera. Continuaron los disgustos. Ella enfermó y se fueron a Aibonito. Vivieron luego en Yauco, donde tuvo lugar la primera separación. Según el esposo, estaban en la mesa cuando pasaron anunciando una película e invitó a su mujer a ir a verla. Ella accedió pero él tuvo que salir a comprar una azúcar y se retardó porque un señor le habló de un trabajo. Cuando regresó, ella se había desvestido y le dijo que era un canalla, que la había dejado vestida, que eso no se hacía con una señora y que sabía que estaba con otras mujeres. Luego, como

a las nueve y media de la noche cambió de parecer y dijo: "Vamos al cine." Entonces él se negó. Ella le cogió el periódico que estaba leyendo y dijo: "Vas al cine a fe de que me llamo Elvira." Él le habló fuerte y la empujó y se cayó y gritó muchísimo. Trató de consolarla y al otro día ella le pidió perdón. La perdonó pero dos o tres días más tarde se repitió la escena y él se fué para Humacao.

Volvió a vivir con ella. Se instalaron en Río Piedras donde ella le dijo que tomaría interés en su trabajo y aprendería a realizarlo porque era inminente la separación y a la larga iban a separarse.

Ella quiso que le comprara una finquita. Fueron a verla acompañados de su hijo y un señor Noya. Hubo un accidente y salieron heridos Noya, él y su hijo. Los llevaron a una clínica de Caguas donde ella se amaneció. Los trasladaron a otra de Río Piedras y ella iba todos los días. Le pidió la póliza de seguro. Al día siguiente volvió. Saludó a su hijo y entonces dirigiéndose a él le dijo, "Toma, so perro indecente la póliza que yo no vuelvo más." Estaba una *nurse* presente y a él le daba vergüenza lo ocurrido. Averiguó por su hijo que la actitud de su esposa se debió a que la había omitido como beneficiaria en la póliza.

Cuando salió de la clínica y fué a su casa, su esposa no lo saludó y siguió su trabajo. Le pidió que le explicara su actitud y se negó a hacerlo. Luego le dijo: "Debieras morirte. Yo no sé que mano salvadora tienes que no te mataste." Pidió un jugo porque se sentía débil y no se lo dieron. Y ese día se fué de la casa para no volver.

Se colocó en la PRRA. Y allá fué ella y al él salir le dijo: "¿Te creías que no te iba a encontrar? Reconciliación no la esperes. He venido a mortificarte y hacerte ir de aquí," y él le decía "Mira, Elvira, estos son terrenos federales y te van a sacar de aquí." Lo llamaba "viejo caduco, fotógrafo ambulante." La escena se repitió. Todos estaban pendientes y cuando ella no iba decían, "No viene hoy." Él

estaba abochornado. Un día le tiró con una sombrilla. Otro tuvo que ir a evitar un escándalo porque quería entrar a la fuerza y un guardia no la dejaba.

Tal el cuadro que describe el marido con mayor extensión y detalles, por supuesto, en una declaración que llena dieciséis páginas de la transcripción.

Fué llamado entonces a declarar Tomás de Jesús Castro, periodista, colocado como el demandante en la PRRA, y que con él salía, allá por el 1937, a preparar informaciones ilustradas. Declaró: "...Yo ví a la señora del señor Delgado penetrar en los terrenos de la PRRA como tres veces. Cada vez que llegaba provocaba allí un ambiente anormal; se expresaba en forma violenta y hubo ocasiones en que las muchachas de la oficina se aglomeraban en las ventanas para ver lo que ocurría abajo.... Yo ví a un 'watchman' sacarla de los terrenos de la PRRA. . . . La actitud de ella era descompuesta completamente; se veía en ella que estaba violenta y una persona en esa actitud no puede estar echando flores. En cuanto al señor Delgado alegaba ella que este hombre no me ayuda, me ha abandonado. Eso es todo lo que recuerdo. . . ."

Llamado nuevamente el demandante, contestando a su abogado dijo que como consecuencia de la actitud de su esposa no podía trabajar bien, se atrasaba en su trabajo y la clientela se retiraba. Se desvelaba por la noche. Se puso muy flaco. Y su vida era un infierno. Repreguntado, admitió que su esposa trabajaba con él en Río Piedras. Dijo que la actitud de su esposa era una cuestión que había que estudiar de una manera científica. El nunca le dió motivo de reproche. Admite que tuvo relaciones "oficiales" con Leticia Arreche, pero "amorosas" no. Conoció a Laura Torres, pero niega que llevara amores con ella. Quizá ella tuvo relaciones con su hijo, a quien llamaba "Pancho." No es cierto que la demanda de divorcio que radicó en Humacao

en 1938, se debiera a las relaciones que tuviera con Leticia Arreche. Se debió a los escándalos de la PRRA.

El testigo Francisco Navarro, Jr. declaró que siendo estudiante de la Universidad pudo apreciar que las relaciones entre demandante y demandada en Río Piedras "no eran del todo cordiales y eran muy tirantes. La esposa se quejaba de que el marido se le enamoraba y ella decía que él era un sinvergüenza y un canalla."

Declaró por último Aurelio Miró, relojero, de setenta y siete años de edad. Conoció a los esposos Delgado Mercado en Guayama y en Río Piedras. En Río Piedras tuvo su mesa de trabajo en el local en que estaba la fotografía del demandante. Fué testigo de muchos disgustos del matrimonio, y "siempre vió el insulto por parte de la señora." Lo llamaba "perro," "sinvergüenza," y le decía "Merecías que te mataran," "Yo no quiero saber de ti." A repreguntas contestó que negociaba en oro y plata viejos, en pedazos. Los fundía. No tenía permiso federal para traficar en oro.

La evidencia de la parte demandada comenzó por la declaración de la esposa, Elvira Mercado de Delgado. Se le preguntó si había oído lo que acababa de declarar Miró y contestó que sí, agregando: "El llegó a mi casa y puso una mesa para arreglar relojes y empezó a llevar cosas de plata y pedazos de oro y monedas y entonces en mi casa teníamos un motorcito eléctrico, él fundía todo eso y pasaron 15 ó 20 días y me di cuenta de que la detective lo andaba buscando porque él compraba cosas ilícitamente, según los comentarios. Él mismo me dijo que la detective lo había acusado, y que él quería vender antes que se lo quitaran y entonces yo aconsejé a mi esposo para que lo sacara de la casa." Se fué en efecto.

Contestó también que había oído la larga historia de su esposo. No es verdad lo que él dice. Los disgustos que había no eran públicos. Surgieron "porque yo le llamaba la atención y porque yo encontré todas las cartas de Laura To-

rres y yo le decía que no podía vivir en esa forma y él se alborotaba pero no se daba ningún escándalo.'' ''Yo sé que él tiene una hija que vive en el Falansterio y la cría una tía. Yo sé que es hija de él porque él recibió una carta de la madre de la niña, desde Guayama.'' Se refiere a otra carta dirigida a su esposo por Leticia Arreche, en tiempos de la PRRA; Laura Torres no llevaba relaciones con su hijo, ''no, señor, era con Delgado.'' ''Él fué a visitarla a Lares unas cuantas veces y yo lo ví pasear con ella en la Universidad.''

Por esos asuntos eran los disgustos. No había cuestiones económicas. Trabajaban juntos. ''Desde los tres años que nos casamos yo empecé a trabajar con él. . . . Con eso me sostengo.'' Niega que guardián alguno la echara de la PRRA. Tanto su hijo como el hijo del primer matrimonio de su esposo que estaban con ellos ''han tenido un gran cariño por mí, siempre.''

Volviendo al asunto de la Arreche, dijo: ''Me lo dijeron y recibí esa carta y entonces yo, como se trataba de una persona distinguida, fuí a las oficinas del ferrocarril y hablé con don Manuel, el padre de crianza y yo le dije: 'Don Manuel, he recibido esta carta y he venido aquí para evitar un escándalo en la sociedad.' Él leyó la carta y me dijo que no era posible porque él ha llamado a Delgado y le ha negado que llevara amores con ella. El leyó la carta y el efecto que le causó muy horroroso.'' Añadió que su esposo quiso en dos momentos que le entregara la carta, una solo y otra acompañado del Dr. Quevedo.

Dijo que cuando el accidente de automóvil, iba a la clínica todas las mañanas a las seis a bañar a su esposo y a su hijo. Que se dobló un pie y para no asustarlo fué a curarse al Hospital Municipal. Que recibió razón sobre la póliza. El creía que la prima no estaba pagada. Ella, pidiendo el dinero a préstamo, la había satisfecho a tiempo. Cuando fué dado de alta, le mandó un carro a la clínica y se había ido. Regresó a la casa por la tarde diciéndole que había estado

haciendo diligencias por la PRRA. Contestando la pregunta de si había oído declarar a su esposo sobre la demanda de divorcio de Humacao, contestó: "Sí, porque llevaba amores con Rosa Piñero y estaba loco por casarse con ella y tiene una hija de ella viviendo en el Falansterio."

Gregorio Picard, que trabajó varios años en casa del demandante y la demandada, dijo que nunca presenció disgustos violentos entre ellos.

Eligio Mercado, hermano de la demandada, declaró, por último, que muchas veces estuvo en la casa del demandante y de su hermana y no presenció disgustos. Que él lo trataba amigablemente y "En muchas ocasiones él me expuso el estado de salud de ella. Yo desearía que la corte la mandara a retirar a ella para yo explicar el caso."

Se retira la demandada y prosigue el testigo: "En varias ocasiones el señor Delgado me ha hecho la sugerencia de que mi hermana fué operada de los ovarios y por motivo de eso y que él es un hombre completamente joven y necesitaba de otra mujer que esté al alcance de su lujuria."

La evidencia documental la forman tres cartas dirigidas a "Pancho" y firmadas "Laura" y otra fechada en junio 9, 1937, que comienza "Darling" y está firmada por "Doña Pitinga." Todas revelan relaciones amorosas. En la última hay un párrafo que dice: "¡Después de tu divorcio, qué bien lo vamos a pasar!"

En "rebuttal" presentó el demandante al testigo José P. Rivera. Declaró que era empleado de la PRRA y que vió a la demandada dos o tres veces en terrenos de la misma, en el laboratorio fotográfico.

No hay duda alguna que si se cree al demandante y a sus testigos, debe concluirse que la demandada en repetidas ocasiones insultó en público y en privado a su esposo. Pero aún así, no constituyen esos insultos, a nuestro juicio, una fría y deliberada injuria por parte de la esposa, sino más bien expresiones apasionadas, violentas, provocadas por la

conducta del esposo, en armonía con la educación, tempera-
mento y salud de la mujer. Deducir que porque una esposa
diga al esposo en el curso de un disgusto "debías haberte
muerto" desea realmente su muerte o intentaría algo para
que tuviera lugar, no es conforme a la naturaleza humana.

En la propia evidencia del demandante se encuentran los
motivos de la actitud de la demandada. Lo dijimos al co-
menzar a exponerla, al referirnos a la declaración del de-
mandante. Desde Guayama, donde va el matrimonio a re-
sidir por vez primera, surge la desconfianza de la esposa con
motivo de las relaciones del marido con otras mujeres. Así
en Yauco. Así cuando se va a Humacao. Así en Río Pie-
dras.

Del propio testimonio del amigo y compañero de traba-
jos y excursiones del esposo en la PRRA, Castro, aparece
que la esposa se sintió abandonada. Y en cuanto al testi-
monio de Miró, que tanto crédito mereció a la corte senten-
ciadora, según expresamente consignó en su relación del caso
y opinión, sabemos luego, por la declaración de la deman-
dada, por qué se llevó su negocio del local de la fotografía
del matrimonio en Río Piedras.

Y por encima de todo, habla por sí mismo el hecho de que
en ningún caso fué la esposa la que abandonó el hogar. Fué
el esposo el que por su propia determinación salió del mismo,
sin justificación bastante.

Si tras la evidencia del demandante pasamos a la de la
demandada, entonces la causa fundamental, única, de los dis-
gustos surge tan real que no puede dejar de tomarse en con-
sideración. No quedaron huérfanas de prueba las alegacio-
nes de la contestación relativas a las relaciones amorosas del
marido con otras mujeres. Leyendo el testimonio de la es-
posa se queda convencido de la realidad de sus sospechas
confirmadas por las cartas que encontrara dentro de su pro-
pio hogar, dirigidas al marido.

No es que consideremos digna de encomio la conducta de la demandada. No es un ejemplo a seguir. Mucho deja que desear. Pero de los autos surge que fué fiel, que aprendió el arte del esposo y lo ayudó en el sostenimiento del hogar. Que supo atender a su hijo y a otro hijo legítimo del marido y con su solo trabajo ha seguido sosteniéndose cuando el esposo la abandonó.

El mismo incidente de la póliza, aún siendo como lo pinta el marido, es explicable. Una mujer como la demandada, que cuida que el seguro de su esposo se sostenga en vigor y llega hasta contraer deudas para pagar sus primas, que de pronto se entera que el marido ha prescindido de ella al designar beneficiarios, se comprende que se sienta herida, no ya por la falta de la debida protección en su día, si que por el desamor que ello implica.

Bajo las circunstancias que en este caso concurren, conceder el divorcio solicitado por el marido, sería premiar su inconstancia, satisfacer su deseo de romper el vínculo matrimonial porque no le permite vivir su vida como él la entiende, y abrir el camino para por medio de declaraciones abultadas corroboradas por las de amigos y personas prejuiciadas, destruir los hogares a voluntad de uno solo de los cónyuges.

Quizá de hecho más feliz y más libre quedaría la esposa sin un marido que no encuentra en ella la satisfacción que desea, pero ella se opone y estando como está la ley en su favor, las cortes deben sostenerla. Véase *Kennerley* v. *Kennerley,* 29 D.P.R. 777; *Gómez* v. *Trujillo,* 59 D.P.R. 468, y casos citados en ambas decisiones. Como se resolvió en la primera de dichas decisiones "El divorcio es un remedio para beneficio de uno de los esposos agraviados que no ha sido la causa voluntaria y determinante de los actos en que se funda para invocarlo, y no está al alcance de una persona que en desatención de la solemnidad de los lazos conyugales impulsa al otro cónyuge a observar una conducta que sería

inexcusable de cometerse contra un marido o mujer que verdaderamente trataba de sostener las relaciones matrimoniales; así pues, cuando la mala conducta de la parte demandada es consecuencia de la mala conducta de la parte demandante, la separación no debe decretarse.''

*Procede declarar con lugar el recurso y en su consecuencia revocar la sentencia apelada y dictar otra desestimando la demanda, con costas.*