RAYMOND SÁNCHEZ CRUZ, demandante y recurrido, *v.* LORRAINE TORRES FIGUEROA, demandada y recurrente.

*Número:* RE-87-318     *Resuelto:* 8 de marzo de 1989

420

*Orlando Callado Medina, José A. Crescioni Benítez* y *Evelyn Morales Rosario,* de *Servicios Legales de Puerto Rico, Inc.,* abogados de la recurrente; *Jaime Castrillón Ramírez,* abogado del recurrido.

La Juez Asociada Señora Naveira de Rodón emitió la opinión del Tribunal.

El presente caso nos brinda la oportunidad de esclarecer las normas de derecho aplicables a la causal de trato cruel e injurias graves establecida en el Art. 96 del Código Civil, 31 L.P.R.A. sec. 321.

El 6 de mayo de 1987 el Tribunal Superior, Sala de Bayamón, dictó sentencia en la que se decreta el divorcio por la causal de trato cruel a favor del demandante Raymond Sánchez Cruz, se concede la patria potestad y custodia del hijo menor de ambos, y se desestima la reconvención de la demandada Lorraine Torres Figueroa. No conforme, la deman-

dada presentó recurso de revisión en el que se planteó la comisión de cuatro (4) errores que pueden sintetizarse así: erró el tribunal de instancia al determinar que la conducta de la demandada constituía trato cruel, al determinar que la conducta del demandante para con la demandada no constituía trato cruel y al concederle la custodia del hijo al demandante y no a la demandada.

## I

*Hechos relacionados con la acción de divorcio*

El 14 de abril de 1986 Sánchez Cruz presentó demanda de divorcio contra su esposa Torres Figueroa por la causal de trato cruel. Luego de una serie de trámites procesales, el 4 de septiembre de 1987 la demandada presentó contestación enmendada con la cual incluyó una reconvención solicitando el divorcio por la causal de trato cruel.(1)

En el presente caso, las partes contrajeron matrimonio el 21 de julio de 1983 cuando el demandante tenía veintitrés (23) años y la demandada quince (15) años. Durante el matrimonio procrearon un hijo. En los primeros dos (2) años del matrimonio las relaciones entre ellos fueron normales. Luego de este período, "la demandada no cumplió con sus obligaciones matrimoniales para con el demandante. No le tenía preparada su comida a tiempo y se pasaba casi todo el día de visita en unos apartamentos contig[ü]os al de ellos". Anejo 1, pág. 1.(2) En marzo de 1986 el demandante se fue del

---

(1) Entre los actos alegados como trato cruel estaban la extrema indiferencia mostrada por el marido, el haberla abandonado llevándose la mayor parte de los muebles del hogar y el no darle dinero.

(2) En la demanda, sobre este particular, el demandante alegó lo siguiente:
"4. Que la Parte Demandada, de un tiempo a esta fecha ha dejado de cumplir con sus obligaciones como esposa al no preparar la ropa de el Demandante para éste poder asistir a su trabajo, al no prepararle alimentos cuando llega de su empleo a su residencia.

hogar llevándose "todo el mobiliario que había adquirido en venta condicional, dejándole solamente la cama y la cuna del nene" a la demandada. Anejo 1, pág. 2.

A base de estas determinaciones de hecho, el tribunal concluyó que "[l]a conducta de la demandada hacia el demandante durante el matrimonio [era] una constitutiva de trato cruel", mientras que la del demandante hacia la demandada no lo era. Anejo 1, pág. 2.

En relación con estas determinaciones de hecho, de la exposición narrativa de la prueba surge que el demandante declaró escuetamente que la demandada no atendía "sus obligaciones como lo 'tenía' que hacer", que "[a] veces cuando llegaba del trabajo ella no le estaba haciendo la comida porque 'se la pasaba en casa de una vecina'". E.N.P., pág. 1. También expresó que mientras vivieron juntos él satisfacía los gastos de la casa. "No le daba nada a la esposa para que ella administrara. Pagaba todo en la casa él mismo. Cuando ella iba a comprar algo iban los dos juntos."(3)

## II

*La causal de trato cruel*

■   Al interpretar las causales de divorcio, los tribunales de nuestro país no deben abstraerse ni perder de vista la labor y el esfuerzo que, después de varios años, culminó con la aprobación de nueva legislación en el campo del derecho de familia. Tan singular esfuerzo persiguió un solo propósito: la igualdad del hombre y de la mujer dentro de la estructura familiar.

---

"5. La Parte Demandada ha desatendido el hogar de su matrimonio al extremo de pasarse todas las horas del día en la casa de unas amigas suyas residentes de el mismo Condominio donde residen las partes de epígrafe." Anejo 2, pág. 1.

(3) E.N.P., pág. 2.

■ "La Constitución de Puerto Rico representa un hito importante en la lucha de la mujer por la igualdad, pero no significa la culminación o el final de esa lucha. La realidad tiene una capacidad perversa de resistir la ley." J. Trías Monge, *Los Derechos de la Mujer*, 44 (Núm. 1) Rev. C. Abo. P.R. 43, 44 (1981).

Es por ello que nuestra Legislatura, en su afán de hacer del principio una realidad, adoptó legislación que respondiera a tales propósitos:

Se aprobaron medidas enmendatorias del Código Civil para establecer la coadministración por ambos cónyuges de los bienes de la sociedad de gananciales. Este estatuto equipara a la mujer, a nivel de la expresión jurídica, respecto del hombre en las relaciones económicas dentro del matrimonio. . . . *Se aprobaron medidas dirigidas a evitar el discrimen contra las mujeres en los procedimientos de divorcio* o nulidad de matrimonio. Se reconoció el derecho de ambos progenitores a la patria potestad de sus hijos. Antes de aprobarse la Ley Núm. 99 del 2 de junio de 1976, la patria potestad recaía únicamente sobre el padre y sólo en caso de muerte de éste o en casos excepcionales sobre la madre. En virtud de la Ley Núm. 100 del 2 de junio de 1976 se proveyó para que pueda adjudicarse la custodia y patria potestad sobre los hijos menores de edad después del divorcio a la madre o al padre de acuerdo a los mejores intereses de los menores. De igual manera la Ley Núm. 83 de 30 de mayo de 1976 eliminó el discrimen por razón de género que establecía el Código Civil en la selección de las personas llamadas por ley a ser tutores de menores, locos y sordomudos, pu[e]s limitaba las ocasiones en que una mujer podía ser nombrada tutora y establecía nombramiento de un hombre preferencialmente. En 1976 se aprobó una enmienda al Artículo 154 del Código Civil a los fines de disponer que la patria potestad de los hijos no emancipados corresponde a ambos progenitores por igual, hasta entonces el Código Civil atribuía tal poder sólo al padre. En 1980 se autorizó a cual-.quiera de los padres, en caso de tratamiento médico y operación de emergencia de una hija o hijo, a otorgar el consentimiento correspondiente.

Durante la revisión de 1976 de las normas relativas a la familia se eliminó la institución de la dote, todavía vigente en nuestro ordenamiento jurídico a mediados de la década del 1970. *Otra disposición arcaica derogada fue la que exigía a la mujer obedecer* y seguir al marido donde quiera que este fijara su residencia. La Ley Núm. [111] del 2 de junio de 1976 dispuso que los cónyuges decidirán de común acuerdo dónde establecerán su domicilio y su residencia. Fue eliminado también el requisito de los trescientos un (301) días que tenía que esperar la mujer viuda o divorciada antes de contraer un nuevo matrimonio. Asimismo, se estableció la responsabilidad recíproca por parte de los cónyuges de protegerse y satisfacer sus necesidades respectivas; se clarificó que el deber de proveer una pensión alimenticia para el cónyuge demente es obligación de ambos cónyuges. En torno al divorcio se dispuso mediante la aprobación de la Ley 101 del 2 de junio de 1976 que la causal de separación será una de naturaleza no culposa, no se considerará a n[i]nguno de los cónyuges culpable o inocente. Otro cambio importante fue la aprobación de la Ley 119 de 2 de junio de 1976, que autoriza a las mujeres casadas a contratar. Hasta la aprobación de esta ley, las mujeres casadas se incluían entre las personas que no podían prestar su consentimiento para contratar, la disposición enmendada equiparaba a las mujeres casadas con las otras personas impedidas de contratar: los menores de edad, los locos, los sordomudos y los analfabetos.

El 30 de diciembre de 1986 se aprobó la Ley Núm. 5, Ley de Sustento de Menores que establece un procedimiento rápido el cual facilitaría el proceso para establecer las reclamaciones de alimentos. En 1987 se aprobó la Ley Núm. 4 de 5 de marzo, para enmendar la disposición del Código Civil que establecía un discrimen contra la mujer en los matrimonios celebrados en el extranjero cuando uno de los cónyuges fuere puertorriqueño. La disposición del Código Civil establecía que si se trataba de una mujer el matrimonio se regiría por el derecho del país extranjero, pero si se trataba de un hombre el matrimonio se regiría por el ordenamiento jurídico de Puerto Rico. (Énfasis suplido.) E. Vicente, *Las mujeres y el cambio en la norma jurídica*, LVI (Núm. 4) Rev. Jur. U.P.R. 585, 591–593 (1987).

En la interpretación de las referidas disposiciones de ley, la trayectoria de la jurisprudencia de este Tribunal ha sido firme en el apoyo del principio de igualdad. En nuestras más recientes opiniones hemos reiterado la obligación por igual de ambos padres respecto a los alimentos de sus hijos no emancipados —*López v. Rodríguez*, 121 D.P.R. 23 (1988)— así como el reconocimiento de igual derecho a la patria potestad por parte de los padres divorciados, siempre que responda a los mejores intereses del menor. *Torres, Ex parte*, 118 D.P.R. 469 (1987).

Para que este principio de igualdad cobre vida, es menester que socialmente se realicen, y para ello se pongan a su servicio, las energías más decididas de todos los sectores gubernamentales y privados. Nos preocupa el que, a pesar del enfoque que a la luz de lo expuesto debe permear las decisiones de nuestros tribunales, en el caso de autos la sentencia del foro de instancia favorece la filosofía de subordinación en contraposición a la de igualdad, al reflejar la visión de la mujer puertorriqueña descrita por Gordon Lewis en su obra, *Puerto Rico Freedom and Power in the Caribbean*, Nueva York, Monthly Review Press, 1974:

> . . . the Puerto Rican woman is viewed as being inferior to the man; she is even seen as suffering from a mental debility and a moral weakness which require an elaborate system of masculine checks upon her freedom of movement. The twin concepts of virginity and machismo, the Puerto Rican form of male chauvinism, operate to construct and maintain a rigid wall of psychological separation between the sexes at practically every stage of life.

Con este trasfondo, pasemos a analizar la causal de divorcio de trato cruel.

En repetidas ocasiones hemos enunciado el principio de que al ser el matrimonio el fundamento de la familia éste constituye una de las más importantes instituciones del

derecho civil. J.M. Manresa y Navarro, *Comentarios al Código Civil Español*, 6ta ed., Madrid, Ed. Reus, 1969, T. IX, pág. 312; *Morales v. Vélez*, 75 D.P.R. 960 (1954); *Cosme v. Marchand*, 121 D.P.R. 225 (1988). Tan importante es esta institución para nuestra sociedad que para disolver el vínculo matrimonial siempre se requiere la intervención de los tribunales. La disolución sólo se concede si se demuestra, con evidencia admisible luego de una vista en los méritos, que está presente alguna de las causales o circunstancias establecidas por ley o por la jurisprudencia.

Entre las causales de divorcio enumeradas en el Art. 96 del Código Civil, *supra*, se encuentra el trato cruel y las injurias graves. Tradicionalmente se ha reconocido que esta causal se refiere a aquella "acción ejercitada en deshonra, descrédito o menosprecio del otro cónyuge . . . son hechos que perturban la pacífica convivencia de los cónyuges y afectan directamente al deber general de respeto a la persona y a su integridad física. . .". M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, 2da ed., Madrid, Ed. Rev. Der. Privado, 1982, T. II, pág. 276. Para que se decrete el divorcio por la causal de trato cruel no es suficiente que no exista la mejor armonía en el hogar conyugal si se desconocen resultados graves que puedan derivarse de esas desavenencias. Albaladejo, *op. cit.*, pág. 277.

De otra parte, no existe una definición detallada, precisa y sistemática de lo que constituye trato cruel. Esto hace necesario que se estudien y ponderen las circunstancias específicas de cada caso prestando particular atención, entre otras cosas, al medio social, grado de cultura de los cónyuges y la susceptibilidad de los seres involucrados. Albaladejo, *op. cit.*; F.H. Keezer, *Keezer on the Law of Marriage and Divorce*, 3ra ed., Indianápolis, Ed. The Bobbs-Merrill Co., 1946, pág. 411; *Gómez v. Trujillo*, 59 D.P.R. 468 (1941);

*Rundle v. Fraticelli*, 60 D.P.R. 255 (1942); *Delgado v. Mercado*, 60 D.P.R. 585 (1942); *Morales v. Vélez*, supra, pág. 977. No cabe duda que un patrón de trato cruel e injurias graves, que tenga el efecto de hacer intolerable la vida conyugal al extremo de anular los fines legítimos del matrimonio, constituye trato cruel. La conducta que da lugar a la causal debe ser de tal naturaleza que destruya la tranquilidad de espíritu y felicidad de la parte agraviada. De ordinario, no deben constituir trato cruel meras desavenencias que puedan fácilmente olvidarse y que no impidan una reconciliación.

■ En cuanto a la evidencia que debe ser presentada para probar la causal de trato cruel hemos dicho que no basta presentar prueba cualquiera. Quien alegue la existencia de la causal deberá presentar en la vista en los méritos prueba preponderante, clara, satisfactoria y convincente que demuestre la existencia de actos específicos de crueldad o injuria. *Manich v. Quero*, 38 D.P.R. 93 (1928); *Morales v. Vélez*, supra; *Olivieri v. Escartín*, 79 D.P.R. 535 (1956).

En el caso de autos, según surge de la demanda, los alegados actos de trato cruel consistían en que la parte demandada había dejado de cumplir con sus obligaciones como esposa "al no preparar la ropa de el Demandante para éste poder asistir a su trabajo [y] al no prepararle alimentos cuando llega[ba] de su empleo" (anejo 2, pág. 1) y que desatendió el hogar pasándose mucho tiempo en casa de unas amigas.(4) Durante la vista del caso, la única prueba del demandante sobre los supuestos actos constitutivos de trato cruel consistió en su propio testimonio. Por su parte, la demandada declaró refutando al demandante y ofreciendo su propia versión de la situación existente en el matrimonio.

---

(4) El demandante también alegó ciertos hechos ocurridos luego que él abandonara el hogar. El tribunal aparentemente no le mereció credibilidad a su versión sobre el particular.

Relató la forma en que el demandante la trató durante el tiempo en que convivieron y luego de éste abandonar el hogar. Ambos expresaron, sin embargo, que cuando el demandante se fue del hogar se llevó la mayor parte de los muebles y enseres. A base de esta prueba, el tribunal de instancia determinó que el demandante había demostrado la existencia de la causal de trato cruel. No podemos estar de acuerdo.

Una lectura de la exposición narrativa de la prueba claramente refleja que el demandante no demostró la ocurrencia de actos específicos de trato cruel, de una naturaleza y magnitud que hicieran intolerable la vida matrimonial, anulando los fines legítimos de éste. En su testimonio el demandante se limitó a declarar que su esposa, una joven de unos diecinueve (19) años, sin mucha educación y proveniente de un medio ambiente social de escasos recursos, no atendía sus obligaciones matrimoniales "como lo 'tenía' que hacer" y que desatendió "las cosas del hogar en el 'último tiempo'". E.N.P., pág. 1. La prueba del demandante, a lo sumo, lo que demostró fue la visión de mujer subordinada dentro del matrimonio que éste tenía y que no existía la mejor armonía en el hogar conyugal. El demandante estableció que entre los esposos habían desavenencias, pero éstas decididamente no eran de una naturaleza que impidiese una posible reconciliación.

Debe tenerse siempre presente que el *status* del matrimonio no es meramente contractual, donde las partes tienen derecho a exigir el estricto cumplimiento de las obligaciones contraídas. El matrimonio tiene como su eje central la naturaleza humana, con sus fragilidades y debilidades, al igual que con su fortaleza. Éste se nutre del esfuerzo de ambas partes para limar asperezas y resolver los conflictos, reestablecer la armonía y conseguir la reconciliación. Para disolver el vínculo matrimonial hay que probar que existen causas graves y sustanciales. *Olivieri v. Escartín*, supra. En

casos de tan alto interés público como son los de divorcio, el tribunal tiene el deber de cerciorarse que están presentes los elementos que requiere el Estado para disolver la unión entre los cónyuges. *Morales v. Vélez*, supra. En el caso de autos, el demandante no cumplió con el peso y *quantum* de la prueba impuesto a quienes deseen probar la existencia de trato cruel e injurias graves como fundamento para el divorcio.

Analicemos ahora la conducta del demandante para con la demandada. Del testimonio del propio demandante surge, con meridiana claridad, la posición de subordinación y servilismo en que éste mantenía a su esposa. Durante el matrimonio él, aunque satisfacía los gastos de la casa, no permitía que ella participara en la administración de los bienes familiares, al extremo de que "[c]uando ella iba a comprar algo iban los dos juntos". E.N.P., pág. 2. Éste, aparentemente, concebía la relación con su esposa como una en la que él, como la parte dominante de la sociedad conyugal, tenía control absoluto de las decisiones que afectaban a la pareja; mientras que ella quedaba relegada a un papel servil a ser desempeñado de acuerdo con los criterios y exigencias de su marido.(5) En tan baja estima tenía el demandante a su esposa que, al abandonar el hogar, "se llevó todo el mobiliario . . . dejándole solamente la cama y la cuna del nene". Anejo 1, pág. 2.

■ No cabe duda que esta conducta y actitud de menosprecio hacia el valor personal de la esposa constituye una afrenta a su dignidad. Crea una situación de agravio intole-

---

(5) Un incidente con el niño cuando ya estaban separados demuestra claramente en la poca estima en que, como ser humano, el demandante tenía a la demandada. Ni siquiera la consideró capacitada y apta para atender y dar tratamiento a su hijo para una irritación en el área de los órganos genitales. Optó por quitarle la custodia del niño y que otra persona se encargara de su cuido y tratamiento.

rable que genera odio y sospecha, a la par que enajena y dificulta la convivencia matrimonial. Constantes y continuados ataques a la autoestima de una persona constituyen actos que pueden dar lugar a la causal de trato cruel. Véase H.L. Silverman, *Marital Therapy: Moral, sociological and Psychological Factor*, Charles C. Thomas, Publisher, 1972, págs. 127–130.

## III

*Hechos relacionados con las determinaciones de custodia*

La doctrina reiterada en nuestra jurisdicción es que, en relación con la concesión de custodia de un menor, los tribunales deberán guiarse siempre por el bienestar y los mejores intereses de dicho menor. Art. 107 del Código Civil, 31 L.P.R.A. sec. 383. *Marrero Reyes v. García Ramírez*, 105 D.P.R. 90 (1976); *Centeno Alicea v. Ortiz*, 105 D.P.R. 523 (1977); *Nudelman v. Ferrer Bolívar*, 107 D.P.R. 495, 508 (1978); *Torres, Ex parte*, 118 D.P.R. 469 (1987). Al hacer la determinación sobre custodia, los tribunales deberán tomar en consideración, entre otros, factores tales como: la edad del menor, su sexo, su salud mental y física, su preferencia, la habilidad de las partes para satisfacer las necesidades afectivas, económicas y morales del menor, y la interrelación del menor con los padres. *Castro v. Meléndez*, 82 D.P.R. 573 (1961); *Marrero Reyes v. García Ramírez*, supra.

En el caso de autos, en relación con la custodia del menor, además de las partes declararon Neida Velázquez Negrón, Trabajadora Social de la Oficina de Relaciones de Familia, y el Técnico de Servicios Sociales Antonio Vargas Bernard. El tribunal también tuvo el beneficio del informe preparado por la señora Velázquez Negrón. Un análisis integral de la totalidad de la exposición narrativa de la prueba y del informe refleja que el tribunal de instancia no abusó de su discreción al otorgar la custodia al padre. De la prueba surge que aun-

que tanto el padre como la madre interaccionan afectiva y adecuadamente con el menor, el padre parece, al momento, estar en mejor posición para atender el bienestar físico y emocional del niño.

El récord en este caso no refleja error manifiesto, prejuicio, parcialidad o pasión, por lo que no existe fundamento en derecho para intervenir con la determinación de los hechos que hizo el tribunal de instancia con respecto a la custodia del menor. *Pueblo v. Cabán Torres*, 117 D.P.R. 645 (1986); *Pueblo v. Miranda Ortiz*, 117 D.P.R. 188 (1986); *Pueblo v. Borrero Robles*, 113 D.P.R. 387 (1982). El tribunal de instancia conserva jurisdicción sobre esta materia, por lo cual si en cualquier momento cambian las circunstancias que dieron lugar a la presente determinación de custodia, cualesquiera de las partes podrá recurrir al mismo y solicitar la modificación que estime pertinente. *Sterzinger v. Ramírez*, 116 D.P.R. 762 (1985); *Marrero Reyes v. García Ramírez*, supra; *Medina v. Tribunal Superior*, 104 D.P.R. 346 (1975).

Por todo lo antes expuesto, *se dictará sentencia que modifique la dictada por el Tribunal Superior, Sala de Bayamón, el 6 de mayo de 1987. Se revocará la parte de la sentencia que decreta el divorcio por trato cruel a favor del demandante Sr. Raymond Sánchez Cruz, se concederá el divorcio por la causal de trato cruel a favor de la demandada Sra. Lorraine Torres Figueroa y se devolverá el caso al tribunal de instancia para procedimientos ulteriores compatibles con lo aquí expuesto.*

El Juez Asociado Señor Rebollo López concurre con el resultado. El Juez Asociado Señor Ortiz no intervino.