Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL I

| | | |
|---|---|---|
| LEARSI BERRÍOS TOSSES<br><br>Demandante-Peticionaria<br><br>v.<br><br>ALFREDO COLÓN MATOS<br><br>Demandado-Recurrido | TA2025CE00008 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala de Caguas<br><br>Civil núm.:<br>E DI2017-0431 (601)<br><br>Sobre: Divorcio |

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Pagán Ocasio y el Juez Rodríguez Flores.

Sánchez Ramos, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 26 de junio de 2025.

Luego de aproximadamente dos años de separación, el Tribunal de Primera Instancia ("TPI") ordenó la reanudación de unas relaciones paternofiliales (jueves a domingo, sin supervisión) entre un menor de 10 años de edad y su padre. Según explicamos en detalle a continuación, concluimos que erró el TPI, pues (i) el propio tribunal acertadamente había dispuesto, en enero de este año, que estas relaciones se mantendrían suspendidas hasta que el padre fuese objeto de unas evaluaciones sicológicas y sobre capacidades protectoras, lo cual no se ha acreditado haya ocurrido; (ii) el más reciente informe pericial recomendó que, al reanudarse las relaciones paternofiliales, ello debía ocurrir por fases, e inicialmente de forma supervisada en un ambiente clínico y neutral; y (iii) no surge del récord, ni se alega, algún cambio de circunstancias o emergencia que, en atención al mejor bienestar del menor, pudiese justificar que, sin vista previa, el TPI actuara en contra de su orden anterior y de lo recomendado en el referido informe.

I.

El Sr. Alfredo Colón Matos (el "Padre") y la Sa. Learsi Berríos Tosses (la "Madre") estuvieron casados entre sí y procrearon al menor ANCB[1] (el "Menor" o el "Hijo"), quien recientemente cumplió diez (10) años de edad.

El 19 de mayo de 2017, la Madre presentó una petición de divorcio por ruptura irreparable. A pesar de haber sido debidamente emplazado y citado para la vista de divorcio, el Padre no compareció. Mediante una *Sentencia* dictada el 31 de agosto de 2017, el TPI decretó disuelto el vínculo matrimonial. En lo pertinente a la controversia que nos ocupa, el TPI dispuso que la patria potestad sería compartida y la custodia la ostentaría la Madre.[2]

El 18 de noviembre de 2022, el Padre presentó una *Urgentísima Moción en Solicitud de Órdenes, Segunda Solicitud de Desacato por Reiterado Incumplimiento con Relaciones Paternofiliales y Otros Extremos.* Sostuvo que, desde el 9 de marzo de 2022, cuando presentó una *Moción* al respecto, había denunciado un patrón reiterado de incumplimiento de la Madre en cuanto a las relaciones paternofiliales.

Además, notificó que se había mudado a Puerto Rico y, por tanto, solicitó que se le permitiera relacionarse con el Menor de manera presencial desde el sábado 19 de noviembre hasta el domingo 20 de noviembre de 2022. En la alternativa, el Padre solicitó que se le ordenara a la Madre entregar al Menor el mismo día a las 6:00 pm.

---

[1] Por tratarse de menor de edad hacemos referencia a este mediante sus iniciales.
[2] Tomamos conocimiento judicial de que las partes están enfrascadas en una controversia en torno a la fijación de una pensión alimentaria a favor del Menor. Mediante una *Resolución* notificada el 23 de abril de 2024, el TPI acogió una solicitud de reconsideración de la Madre y mantuvo la pensión alimentaria anteriormente fijada en una *Resolución* del 11 de octubre de 2023. El 27 de junio de 2024, otro Panel de esta curia rehusó revisar lo actuado por el TPI. (KLCE202400676).

El 21 de noviembre, notificada el 23 de noviembre de 2022, sin la celebración de una vista, el TPI dictó una *Orden* en la que autorizó las relaciones paternofiliales desde el 27 de noviembre al 1 de diciembre de 2022.

El 31 de enero de 2023, el Padre instó una *Moción Informando Incumplimiento con Relaciones Paternofiliales por Razón de Enajenación Parental y Solicitud Urgente de Custodia*.

El 16 de febrero de 2023, el TPI notificó una *Orden* en la que estableció que, desde el 1 de diciembre de 2022, había referido el caso para evaluación de custodia compartida o monoparental a la Unidad de Trabajo Social de Relaciones de Familia. Además, refirió el caso a la perito, Dra. Rowina Rosa Pimentel (la "Perito"), para evaluación de enajenación parental. Se mantuvieron las relaciones paternofiliales establecidas en una vista celebrada el 1 de diciembre de 2022 y se le ordenó al Padre unirse a la terapia del Menor.

Al cabo de algunos incidentes procesales, el 27 de junio de 2023, la Madre interpuso una *Moción Informativa Sobre Orden de Protección a Tenor con Ley 246*. Se informó que el Menor estuvo con el Padre desde el jueves 15 de junio hasta el jueves 22 de **junio de 2023**.

La Madre sostuvo que, al serle devuelto de esta visita, observó un golpe en la boca del Menor y hematomas en varias partes del cuerpo. El Menor le expresó a su padrastro que el golpe obedeció a que **el Padre lo empujó por unas escaleras, luego de lo cual se burló de este y le amenazó con pegarle si decía lo ocurrido**. A raíz de lo anterior, la Madre informó que presentó una querella ante el Departamento de la Familia y solicitó una orden de protección ex parte. El Tribunal Municipal **concedió la orden de protección, suspendió las relaciones paternofiliales** y ordenó al Departamento de la Familia investigar.

Subsiguientemente, el **5 de septiembre de 2023**, el Tribunal Municipal celebró la vista final sobre orden de protección. Culminada la vista, **el Tribunal Municipal extendió por un año la vigencia de la orden de protección y la suspensión de las relaciones paternofiliales** (la "Orden de Protección de 2023"). A raíz de comentarios que hizo el Menor, también se le refirió a CIMVAS.[3]

Luego de varios trámites procesales, el 31 de enero de 2025, el TPI notificó una *Orden* (la "Orden de Enero") en la que dispuso lo siguiente:

> Atendida la "moción informativa" presentada por el Dr. Gerardo Sanz Lebrón, Psicólogo Clínico y Forense el 17 de diciembre de 2024, el Tribunal RESUELVE:

> Enterada. Se mantiene la orden del 07 de enero de 2025, en cuanto al plan de servicio. **Se paralizan las relaciones paternofiliales hasta que el demandado se realice una evaluación psicológica, psiquiátrica y una evaluación de capacidades protectoras**.[4] (Énfasis provisto).

El 23 de mayo de 2025, la Perito notificó un *Informe de Evaluación Psicológica* (el "Informe"). El 30 de mayo, notificada el 4 de junio, el TPI ordenó que se notificara el Informe a las partes y concedió un término de treinta (30) días para que se expresaran en torno al mismo.

El 5 de junio de 2025, el Padre presentó una *Urgentísima Moción en Solicitud de Orden Sobre Relaciones Paternofiliales Durante el Día de los Padres*. Sostuvo que desde hacía dos (2) años no podía relacionarse con el Menor. Afirmó que las alegaciones de abuso sexual del Menor resultaron falsas y que la evaluación de enajenación parental pudo ser completada. Sin mencionar los hallazgos y recomendaciones del Informe, el Padre solicitó que se le

---

[3] Centro de Servicios Integrado para Menores Víctimas de Abuso Sexual.

[4] Entrada [9] de Sistema Único de Manejo y Administración de Casos (SUMAC TPI).

permitiera relacionarse con su hijo el Día de los Padres (15 de junio de 2025).

El 9 de junio, la Madre se opuso a la solicitud del Padre, mediante una *Oposición a que se Obligue al Menor a Relacionarse con el Demandado*. Aclaró que las relaciones paternofiliales no fueron suspendidas por alegaciones de abuso sexual, sino que el Tribunal Municipal las suspendió por maltrato físico validado por el pediatra, el psicólogo y el propio Menor. En cuanto a las alegaciones de abuso sexual, clarificó que estas fueron levantadas por el Menor a la Trabajadora Social y que, luego de una entrevista en CIMVAS, dichas alegaciones no fueron validadas. Arguyó que del Informe surgían alegaciones de enajenación parental en contra de ambos progenitores. Más importante aún, observó que del Informe surgían recomendaciones para trabajar con ambos padres y que el restablecimiento de las relaciones paternofiliales debía darse por fases durante las cuales se confirmase que las partes cumplían con las recomendaciones.

En igual fecha, 9 de junio, el TPI ordenó las relaciones paternofiliales para el Día de los Padres, según solicitado por el Padre, desde las 10:00 am hasta las 6:00 pm; se designó la Comandancia de la Policía de Caguas como lugar de recogido. Además, señaló una vista para la lectura del Informe de la Perito para el **1 de julio de 2025**.

El 11 de junio, la Madre solicitó la reconsideración de esta decisión, lo cual fue denegada por el TPI mediante una *Orden* emitida ese mismo día.

Llegado el 15 de junio, en la Comandancia de la Policía, **el Menor rehusó irse con su Padre**.

Al día siguiente, 16 de junio, el Padre incoó una *Urgentísima Moción en Solicitud de Desacato por Incumplimiento con Orden Sobre Relaciones Paternofiliales Durante el Día de los Padres* (la "Moción").

En igual fecha, el TPI notificó una *Resolución* en la que ordenó las relaciones paternofiliales a partir de las 5:00 pm del jueves, 19 de junio de 2025, hasta las 5:00 pm del domingo, 22 de junio de 2025 (el "Dictamen"). Además, el TPI le advirtió a la Madre que, de incumplir con lo ordenado, se exponía a un desacato y a que se removiera al Menor del hogar materno.

En desacuerdo, el 17 de junio, la Madre interpuso el recurso de *certiorari* de referencia; formuló dos (2) señalamientos de error:

> Primer Error: Erró el TPI al ordenar un cambio en el estado de derecho sobre las relaciones filiales del menor, sin la celebración de una vista, sin tomar en cuenta que el menor fue víctima de maltrato por el padre y la peticionaria víctima de violencia doméstica en un claro abuso de discreción.

> Segundo error: erró el TPI al restablecer las relaciones paternofiliales del Menor con su padre apartándose de las recomendaciones consignadas en el recién informe de la perito nombrada por el tribunal para ello, el cual indica un proceso específico y científicamente probado para trabajar ese tipo de casos.

Afirmó que la ejecución del Dictamen "representaría un riesgo [a la] salud mental y física" del Menor. Alegó que el Menor "padece de condiciones especiales y recibe terapias casi a diario". Sostuvo que el Menor "apenas conoce" al Padre porque "entre 2017 y 2022", el Padre había abandonado la jurisdicción "tras haberse expedido órdenes de protección en su contra.

El 18 de junio, ordenamos la paralización del Dictamen y de todos los procedimientos ante el TPI.[5] Además, le ordenamos al Padre mostrar causa por la cual no debíamos expedir el auto solicitado y revocar el Dictamen.

El 23 de junio, el Padre compareció; señaló que, mientras estuvieron vigentes, la Madre había entorpecido las relaciones

---

[5] La Madre luego nos informó que, el 17 de junio, pero "reducida a escrito el 20 de junio", el TPI emitió una Resolución mediante la cual adjudicó una moción presentada por el Dr. Gerardo Sanz Lebrón y en la cual determina que "se mantiene la Resolución del 16 de junio de 2025". En la medida que esta determinación se formalizó luego de que paralizáramos "todos los procedimientos" ante el TPI en este caso, la misma es inoficiosa y, para todo efecto jurídico, es nula.

paternofiliales y negó haber cometido el maltrato físico que desembocó en la Orden de Protección de 2023. Resaltó que, según los hallazgos del Informe, había múltiples indicadores de "enajenación por parte de la madre". Arguyó que el Dictamen era razonable, pues respondía al bienestar del Menor y a la "necesidad inmediata de restablecer un vínculo" entre el Padre y el Menor, y que, si bien el Informe recomienda un método al respecto, ello no opera "una camisa de fuerza que anula la discreción judicial". Planteó que, aunque "forzar a un menor no es ideal", "continuar permitiendo que un proceso de enajenación se perpetúe es, sin duda, más perjudicial". Resolvemos.[6]

## II.

El derecho a mantener relaciones paterno o materno filiales, según sea el caso, es uno apremiante y repercute sobre la política pública a tal punto que los tribunales "pueden regular las relaciones paternofiliales, pero no pueden prohibirlas totalmente, a menos que existan causas muy graves para hacerlo". *Sterzinger v. Ramírez*, 116 DPR 762, 775 (1985). Además, son parte integral del desarrollo multidimensional de un menor de edad. *Íd.*

Una vez el tribunal sentenciador otorga la custodia a uno de los progenitores, el progenitor no custodio conserva el derecho de mantener relaciones paterno o materno filiales con el menor. Estas relaciones están revestidas de protección constitucional, al amparo del derecho a la libertad garantizado por la Decimocuarta Enmienda de la Constitución de los Estados Unidos. *Santana Medrano v. Acevedo Osorio*, 116 DPR 298, 302 (1985).

Claro está, la norma en cuanto al establecimiento de relaciones filiales tiene preminentemente como norte la protección y el mejor interés del menor. *Sánchez Cruz v. Torres Figueroa*,

---

[6] El 25 de junio, la Madre solicitó autorización para replicar a lo expuesto por el Padre; hemos determinado denegar esta solicitud.

123 DPR 418 (1991). Es decir, el derecho a las relaciones familiares no es absoluto, por lo que puede limitarse a fines de propiciar el interés apremiante del Estado de proteger el bienestar de los menores. *Rivera Aponte v. Morales Martínez*, 167 DPR 280, 290 (2006); *Rexach v. Ramírez*, 162 DPR 130, 146 (2004).

Al adjudicar asuntos de esta naturaleza, el tribunal tiene la obligación de sopesar integradamente todos los factores que tenga a su alcance para lograr la solución más justa posible. *Sánchez Cruz*, 123 DPR a la pág. 431; *Nudelman v. Ferrer Bolívar*, 107 DPR 495, 511 (1978). Dichos factores consisten en: (a) la preferencia del menor, su sexo, edad y salud mental y física; (b) el cariño que pueda brindársele por las partes en controversia; (c) la habilidad de las partes para satisfacer debidamente las necesidades afectivas, morales y económicas del menor; (d) el grado de ajuste del menor al hogar, la escuela y la comunidad en que vive; (e) la interrelación del menor con las partes, sus hermanos y otros miembros de la familia y; (f) la salud síquica de todas las partes. Raúl Serrano Geyls, Derecho de Familia de Puerto Rico y Legislación Comparada, Vol. I, Programa de Educación Jurídica Continua UIPR, 1997, pág. 724. Lo anterior cobra mayor importancia en aquellos casos en los que los progenitores no se ponen de acuerdo en cómo se reglamentarán las relaciones paternofiliales o cuando estas tienen un efecto adverso a los intereses de los menores. *Sterzinger*, 116 DPR a la pág. 778.

Finalmente, al dictar la forma en que se reglamentarán los derechos de visita del padre no custodio, el tribunal deberá asegurarse de que este último está capacitado para tener la compañía de su hijo fuera del ámbito del otro progenitor por determinado tiempo, el cual podría ser desde unas horas hasta varios meses. De ordinario, se permitirá el derecho a tener la compañía temporera del menor de la forma más amplia y razonable

posible, de acuerdo con las circunstancias y el bienestar del menor. Ello con el propósito de garantizar el derecho fundamental del padre o madre no custodio a la privacidad e intimidad en las relaciones familiares con sus hijos. *Sterzinger*, 116 DPR a las págs. 778-779.

III.

Concluimos que erró el TPI al emitir el Dictamen. En primer lugar, el Dictamen es contrario a la Orden de Enero, mediante la cual el TPI dispuso que "se paralizan las relaciones paternofiliales hasta que el demandado se realice una evaluación psicológica, psiquiátrica y una evaluación de capacidades protectoras". No se ha alegado, ni surge del récord, que el Padre haya cumplido con estas condiciones, establecidas por el propio TPI (evaluación sicológica, evaluación siquiátrica y evaluación de capacidades protectoras).

Tampoco surge del récord razón alguna para apartarse de la hoja de ruta marcada por el TPI en la Orden de Enero. Adviértase que la misma respondió al hecho de que las relaciones paternofiliales habían estado suspendidas por más de un año (al menos hasta septiembre de 2024) por virtud de la Orden de Protección de 2023. A su vez, la Orden de Enero respondió a unas alegaciones, evidentemente creídas por un tribunal, a los efectos de que el Padre había incurrido en un serio acto de maltrato físico contra el Menor. Ante ello, fue muy prudente que el TPI estableciera, como condición para reanudar las relaciones paternofiliales, que el Padre se sometiese a las referidas evaluaciones.

En segundo lugar, el Dictamen es contrario a lo recomendado en el Informe. En el mismo se recomienda un "plan de tratamiento e intervención ... para superar la resistencia/rechazo del menor ... hacia su padre". Dicho tratamiento debe estar dirigido a "cambiar el comportamiento de los padres, reducir el nivel de conflicto y

mejorar la comunicación".  Se recomendó "referir al menor y ambos progenitores a intervención terapéutica".

En cuanto a las relaciones paternofiliales, el Informe recomienda un plan específico, diseñado "para garantizar la seguridad del menor, posterior al referido de maltrato físico fundamentado, y para evitar la posibilidad de interpretaciones distorsionadas sobre la interacción entre el padre y el menor". Según dicho plan, sería "únicamente el profesional especializado ... quien oriente al menor sobre el inicio" de las relaciones paternofiliales.  A su vez, se establecería un "programa de visitas supervisadas transicionales ... con un plan para disminuir supervisión progresivamente".  En específico, se recomendaron varias fases, la primera de las cuales constaría de **"visitas supervisadas en entorno clínico neutral", por seis semanas**.

En tercer lugar, si bien el TPI no está obligado por las recomendaciones del Informe, en atención a las mismas, en atención a la Orden de Enero, y en ausencia de una situación de emergencia (evidentemente no presente aquí), no existe justificación para, particularmente sin una vista previa, abruptamente ordenar varios días de relaciones paternofiliales no supervisadas, como ocurrió a través del Dictamen.  Adviértase que el propio TPI, desde principios de junio, había pautado una vista para el 1 de julio con el fin de evaluar las recomendaciones del Informe.  Los tribunales debemos procurar, hasta donde ello sea humanamente viable, resolver este tipo de controversias luego de haber recibido toda la información que podría ser pertinente al asunto del mejor bienestar del (o la) menor.

El hecho de que el Menor se haya rehusado a irse con el Padre el 15 de junio de 2025, a pesar de lo ordenado al respecto por el TPI, no constituye una razón válida para, sin una vista previa y sin una emergencia que pudiese afectar al Menor, alterar el curso pautado

por la Orden de Enero, particularmente cuando ello también es contrario a lo recomendado en el Informe. La realidad es que, como bien señaló el Informe, el Menor "muestra rechazo categórico ante cualquier contacto con el padre". No obstante, no estamos ante una simple competencia entre dos adultos, sino que está involucrado el mejor bienestar de un menor, consideración que tiene primacía sobre cualquier otra.

Precisamente por la evidente resistencia del Menor a compartir con su Padre, y por la realidad de que se trata de un niño de 10 años que debe ser protegido, es que en el Informe se recomienda una forma específica de orientar al Menor sobre cualquier reanudación de relaciones paternofiliales, así como una manera gradual y cuidadosa de re-iniciar las mismas en un contexto clínico, supervisado y neutral. Aunque el Informe concluye que parte de ese rechazo al Padre podría estar relacionado con una conducta inapropiada de la Madre, también se reconoce que un componente del rechazo podría relacionarse con el maltrato del Padre relacionado con la Orden de Protección de 2023.

En fin, la actuación del TPI no encuentra apoyo en la totalidad del récord del caso. El TPI tampoco formuló determinación de hecho alguna que pudiese respaldar la conclusión de que el cambio abrupto en las relaciones paternofiliales respondería al mejor bienestar del Menor. Al contrario, el récord lo que sugiere es que la implantación de lo dispuesto en el Dictamen podría hacer daño al Menor y agravar, en vez de mejorar, el problema existente en la relación entre Padre e Hijo.

Es imperativo que el TPI, al continuar el caso, vele porque todas las partes (Padre, Madre, Menor) reciban las terapias que evidentemente necesitan. El récord demuestra que ambos progenitores necesitan urgentemente terapias que les permitan hacer introspección sobre cómo la conducta de cada uno contribuye

al problema existente y sobre cómo pueden modificarla para lograr el mejor bienestar del Menor.  A la misma vez, cualquier decisión sobre custodia o relaciones paternofiliales debe tener como principal determinante el mejor bienestar del menor.

V.

Por los fundamentos que anteceden, se expide el auto de *certiorari* solicitado, se revoca la *Resolución* recurrida y se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos de forma compatible con lo aquí dispuesto y resuelto.  Al amparo de la Regla 35 (A)(1) de nuestro Reglamento,[7] **el Tribunal de Primera Instancia puede proceder de conformidad con lo aquí resuelto, <u>sin que tenga que esperar por nuestro mandato</u>.**

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[7] Regla 35 (A)(1): "La presentación de una solicitud de certiorari no suspenderá los procedimientos ante el Tribunal de Primera Instancia, salvo una orden en contrario expedida por iniciativa propia o a solicitud de parte por el Tribunal de Apelaciones. La expedición del auto de certiorari suspenderá los procedimientos en el Tribunal de Primera Instancia, **salvo que el Tribunal de Apelaciones disponga lo contrario**."  4 LPRA Ap. XXII-B R. 35.